UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BEATRICE CUSHNER,<br><br>                      Plaintiff,<br><br>     -against-<br><br>THOMAS W. JACOBS and JACOBS<br>COMMUNICATIONS GROUP LLC d/b/a BNC Voice,<br><br>                  Defendants. | Case No.: _____<br><br>**VERIFIED COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff **BEATRICE CUSHNER**, by her attorneys, **LEVITT LLP**, as and for her Verified Complaint against Defendant THOMAS W. JACOBS and Defendant JACOBS COMMUNICATIONS GROUP LLC d/b/a BNC Voice, hereby alleges as follows:

## THE PARTIES

1.     At all times hereinafter mentioned, Plaintiff BEATRICE CUSHNER (hereinafter referred to as "Plaintiff") was, and still is, a natural person residing in the County of Westchester, State of New York.

2.     Upon information and belief, and at all times hereinafter mentioned, Defendant THOMAS W. JACOBS (hereinafter referred to as "Defendant Jacobs") was, and still is, a natural person residing at 2668 Fountainhead Way, Mt. Pleasant, South Carolina 29466.

3.     Upon information and belief, and at all times hereinafter mentioned, Defendant JACOBS COMMUNICATIONS GROUP LLC d/b/a BNC Voice (hereinafter referred to as "Defendant BNC") was, and still is, a limited liability company authorized and existing under, and by virtue of the laws of the State of New York and with its principal place of business at 2668 Fountainhead Way, Mt. Pleasant, South Carolina 29466.

4.      Defendant Jacobs and Defendant BNC are collectively hereinafter referred to as "Defendants".

## JURISDICTION and VENUE

5.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because this action is between citizens of different states and the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

6.      Defendant BNC's citizenship for the purposes of diversity jurisdiction is that of its sole member Defendant Jacobs, South Carolina.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events, omissions, and/or acts giving rise to Plaintiff's claims herein occurred in the Southern District of New York.

8.      The Court has personal jurisdiction over Defendant Jacobs and Defendant BNC as a substantial part of the events giving rise to Plaintiff's claims occurred within New York and Defendant BNC is a domestic limited liability company.

## FACTS COMMON TO ALL ALLEGATIONS

9.      Defendant Jacobs was a sole member of a business named Jacobs Communications Group, LLC since 2007.

10.      In 2008, Defendant Jacobs advised Plaintiff that he was very experienced in many different business areas; he had particular expertise in the communications business area; and he was looking for his newest business venture.

11.      According to Defendant Jacobs, his name in the communications business was well known and respected, and further, a company with his name as part of the company's name would help ensure its success.

2

12.     Defendant Jacobs further advised Plaintiff that he expected his venture to be extremely successful, and urged Plaintiff to invest substantial sums of money in such venture.

13.     Between 2008 and 2009, Plaintiff invested $450,000.00 in Defendant BNC.

14.     In 2010, Plaintiff invested another $235,000.00 in Defendant BNC.

15.     In 2011, Plaintiff invested another $805,000.00 in Defendant BNC.

16.     In 2012, Defendant Jacobs asked for further monetary contributions insisting that the "big break" was nearing.

17.     On or about September 2, 2012, Plaintiff and Defendants entered into an Amended Operating Agreement of Jacobs Communications Group LLC and Plaintiff was granted a thirty-five percent (35%) equity interest in Defendant BNC in the form of a newly created Class B membership interest, in consideration for a capital contribution of $1,000,000.00.

18.     Defendant Jacobs was the Managing Member of Defendant BNC.

19.     Based on Defendant Jacobs' representations that the business would be successful, Plaintiff invested additional monies in Defendant BNC, both as capital and as loans.

20.     By the end of 2012, Plaintiff had invested $1,978,233.50 in Defendant BNC.

21.     In 2013, Plaintiff invested another $196,700.00 with the assumption that Defendant BNC was doing well.

22.     In 2014, Plaintiff made three additional investments in Defendant BNC in the total amount of $160,000.00.

23.     In 2015, based on Defendant Jacobs representations that business was going well, Plaintiff made two additional investments in Defendant BNC in the total amount of $240,000.00.

24.     In 2016, Plaintiff made four additional investments in Defendant BNC in the total amount of $215,000.00.

25.     In January 2017, Plaintiff made two additional investments in Defendant BNC in the total amount of $75,000.00.

26.     On March 16, 2017, Plaintiff gave Defendant Jacobs an additional $60,000.00 check and informed him that it was the last check Plaintiff would give him.  Plaintiff advised Defendant Jacobs that she was uncomfortable investing any more money and Defendant Jacobs would have to find another investor for any additional funds.

27.     On April 12, 2017, Plaintiff was in Nevada when Defendant Jacobs called to say he could not find another investor and needed another $60,000.00.  Plaintiff refused to give him more money.

28.     However, upon returning to New York on April 15, 2017, Defendant Jacobs informed Plaintiff that he could not meet payroll and without additional monies from Plaintiff immediately, Defendant BNC would go out of business.  Surprised that Defendant BNC was not doing well, Plaintiff reluctantly agreed to give him a final check in the sum of $60,000.00, which he picked up on April 18, 2017 with the understanding that Plaintiff would invest no more money in Defendant BNC.

29.     Subsequently, in January 2018, Defendant Jacobs asked Plaintiff to co-sign a BFS Capital high interest loan so he could "could get over the last hump" and "move into a cash flow positive position…"  Defendant Jacobs told Plaintiff that this is a really good time in the company's history, and he did not want to stop the momentum and that he wanted to earn Plaintiff's trust back and it was important that Plaintiff was onboard now.  Plaintiff asked him to

forward the BFS Capital paperwork told Defendant Jacobs she would discuss it with her husband.

30.     Upon reviewing the BFS Capital documents, Plaintiff found that her electronic signature had, without her knowledge or approval, already been affixed to the loan documents. Plaintiff also discovered that her security questions had previously been provided to BFS Capital on April 14, 2017, exactly two days after Plaintiff spoke with Defendant Jacobs and told him that she would not give him any more money.  BFS Capital was able to provide Plaintiff with all the time stamps and detailed info on the electronic signatures.  All signatures came from Defendant Jacob's email and Plaintiff's electronic signature and security questions were submitted exactly three (3) minutes after Defendant Jacob's signature.  That loan was approved and the proceeds were sent to Defendant BNC in the amount of $98,000.00 requiring a repayment amount of $136,220.00.

31.     Defendant Jacobs not only processed that loan without telling Plaintiff, but four days later he picked up the $60,000.00 check even though he knew he had already processed the BFS Capital loan with a fraudulent co-signer.

32.     Plaintiff confronted Defendant Jacobs with the documents from BFS Capital, he claimed that it was all a "mystery to him" but that it was important that Plaintiff was onboard with this new loan.  He said he "hoped I could get past this and focus on the immediate future which looks really good."

33.     When Plaintiff asked for additional information from BFS Capital, Defendant Jacobs said to forget it, he was not moving forward with the loan anymore.  Plaintiff told Defendant Jacobs that she planned to continue exploring how the 2017 loan was approved and

that unless there was a good explanation, the only way Defendant could move forward with funding was to sell Defendant BNC.

34.     At that juncture, Plaintiff became very concerned with Defendant Jacob's behavior and worried about what other liabilities Plaintiff could be responsible for.  Plaintiff felt she had no choice to end the partnership.

35.     After ten years, Defendant BNC had never made any money, and was a complete failure.

36.     Thereafter, Defendant BNC received an offer from FluentStream Technologies, LLC (hereinafter referred to as "FluentStream") to purchase all of the assets of Defendant BNC as an on-going business concern.

37.     The sales contract with FluentStream in December 2018, would not only provide for no profit, but it did not even cover Plaintiff's investments in Defendant BNC.  Instead, the purchase price would result in a substantial loss to Plaintiff, but Plaintiff thought it would end the mismanagement and fraudulent activity by Defendant Jacobs.  As Plaintiff would later learn, it did not.

38.     Based upon Defendant Jacob's representations, between 2012 and 2018, Plaintiff invested monies in Defendant BNC which in total amounted to $2,984,935.50, as set forth on **Exhibit A** attached hereto and made a part hereof.

39.     During this same time period, Defendant Jacobs paid himself and his wife substantial salaries from Defendant BNC.

40.     On or about October 4, 2018, Defendant Jacobs executed a Non-Binding Term Sheet for the proposed acquisition of assets of Defendant BNC by FluentStream.

41.     On or about December 14, 2018, FluentStream, Defendants and Plaintiff entered into an asset purchase agreement (hereinafter referred to as the "Asset Purchase Agreement") . FluentStream, Defendants and Plaintiff are collectively hereinafter referred to as the "Parties".

42.     The sales price was $2,768,360.00, with additional consideration to be paid pursuant to a Transition Services Agreement, which provided for Defendant BNC to provide management services during the transition period.

43.     Simultaneously with the execution of the Asset Purchase Agreement, at Defendant Jacobs' insistence, Defendants and Plaintiff entered into a Redemption Agreement (hereinafter referred to as the "Redemption Agreement") under which Plaintiff's membership interest was to be redeemed.

44.     The Redemption Agreement provides that Plaintiff is entitled to receive sixty-five percent (65%) of certain of the proceeds of sale (the "Escrowed Funds").

45.     Pursuant to the Asset Purchase Agreement, Redemption Agreement, and Promissory Note, Plaintiff's consideration for the sale was to be paid in three (3) installments over four (4) years, as set forth below.

      (a)     December 19, 2018 – Plaintiff Distribution $532,773.22, plus loan and interest of $257,158.77 (for a total of $789,931.99) ($300,000.00 Defendant Jacobs Distribution);

      (b)     18 Month Escrow Release – a minimum installment of $276,836.00 ($176,836.00 to Plaintiff and a maximum of $100,000 to Defendant Jacobs); and

      (c)     48 Month Promissory Note – a minimum installment of $653,672.00 ($553,672.00 to Plaintiff and a maximum of $100,000.00 to Defendant Jacobs).

46.     At the closing of the sale of Defendant BNC, the sum of $276,836.00 was placed in escrow with Citibank, National Association, as Escrow Agent, for the second payment installment (the "Escrowed Funds").

47.     The Escrowed Funds should have been released in or about July, 2020.

48.     Under the Redemption Agreement, Plaintiff was and is entitled to the sum of $176,836.00, the equivalent of sixty-five percent (65%) of the Escrowed Funds, less any legitimate winding up expenses.

49.     The Redemption Agreement provides that Defendant Jacobs is responsible for absorbing legitimate expenses of the winding up of Defendant BNC equal to his proportionate ownership interest of Defendant BNC or sixty-five percent (65%).

50.     The Redemption Agreement further provides that the maximum amount Defendant Jacobs was to receive thereunder would be $100,000.00.

51.     The Redemption Agreement provides in relevant part as follows:

> 6) b) ii)  Managing Member's proportionate amount of any and all Escrowed Funds (plus proportionate interest) when released by Escrow Agent under the terms and conditions of the Asset Purchase Agreement up to the total of $100,000. For the purpose of this Section 6 b) ii), Managing Members proportionate amount is $100,000 / $276,836 = 36%.  (Emphasis Added)
>
> 6) b) iii) Managing Member's proportionate amount of the principal and interest paid pursuant to the promissory note whenever paid by Purchaser under the terms and conditions of the Asset Purchase Agreement and corresponding promissory note up to the total of $100,000. For the purpose of this Section 6 b) iii), Managing Members proportionate amount is $100,000 / $553,672 = 18%.  (Emphasis Added)

52.     Notwithstanding the foregoing, Defendant Jacobs withdrew the $100,000.00 maximum amount he might have been entitled to "off the top", before any distribution to the

Plaintiff. In fact, when questioned about this, Defendant Jacobs told Plaintiff that he did this because he had to take care of this family.

53.     Additionally, instead of absorbing any legitimate expenses in proportion to their ownership percentages under the Redemption Agreement, Defendant Jacobs has sought to make Plaintiff responsible for sixty-five (65%) of unsubstantiated expenses unrelated to Defendant BNC.

54.     Defendants Jacobs further intentionally misrepresented to Plaintiff the amount of Escrowed Funds and how expenses were calculated.

55.     According to Defendant Jacobs last communication, the total expenses to "close BNC" is in the amount of $133,901.79.

56.     When Plaintiff first questioned the amount of purported expenses deducted, including a $40,000.00 settlement deduction payable to FluentStream, Defendant Jacobs was and still is unable to provide an explanation.

57.     Additionally, no explanation was provided as to: (a) why the cost of the Compliance solutions software was included; (b) why ongoing bookkeeping services were necessary; (c) why the cost for an accountant to prepare a corporate tax filing was so much; (d) what the ongoing bank charges were for; and (e) other unsubstantiated expenses.

58.     Moreover, between October 28, 2020 and January 8, 2021, Defendant Jacobs provided three inconsistent documents entitled "FluentStream/BNC Preferred Custody Account Worksheet (Escrow)" (hereinafter referred to as the "Escrow Worksheet") to Plaintiff.

59.     The initial proposed distributions listed in the October 28, 2020 Escrow Worksheet allotted the amounts of $100,000.00 to Defendant Jacobs and $106,759.89 to Plaintiff. It also included approximately $70,000.00 in expenses.

60.     On October 29, 2020, after Plaintiff questioned Defendant Jacobs' settlement of the Escrowed Funds to FluentStream, Defendant Jacobs then calculated Plaintiff was owed $132,000.00.

61.     On or about October 30, 2020, Defendant Jacobs admitted he did not have enough money in the Escrowed Funds to pay Plaintiff.

62.     One week later, Defendant Jacobs prepared a new proposed distribution.  The distributions listed in the November 7, 2020 Escrow Worksheet were re-allocated in the amounts of $66,563.77 to Defendant Jacobs and $118,335.59 to Plaintiff.  In addition, it included expenses of approximately $92,000.00 of which $18,000.00 were allegedly for "Paid closing expenses" and $16,900.00 was for "Future closing expenses" which were not included in the October 28, 2020 Escrow Worksheet.

63.     Such allocations include a surreptitious repayment to the Escrowed Funds of $40,000.00 that Defendant Jacobs had converted.

64.     On or about November 7, 2020, Defendants also requested Plaintiff to execute a Mutual Escrow Release Agreement wherein Defendant BNC proposed to pay Plaintiff the sum of $118,911.59 from the Escrowed Funds in consideration for a full release of Defendants.

65.     Plaintiff refused Defendants' offer which was less than she was entitled to pursuant to the Redemption Agreement.

66.     Furthermore, the Mutual Escrow Release Agreement did not address Plaintiff's right to the third payment in the sum of $553,672.00 pursuant to the Promissory Note.

67.     Subsequently, Defendant Jacobs provided a third Escrow Worksheet.  This time Defendant Jacobs reduced his distribution to $63,359.72 and offered to Plaintiff $112,639.59.

And the Escrow Worksheet included new categories of "Paid expenses" and "Future expense" in the sums of $38,627.25 and $5,400.00 respectively.

68.     These inconsistent Escrow Worksheets clearly were suspicious and required reconciliation by Defendant Jacobs, however, when Plaintiff questioned where and how Defendant Jacobs arrived at those amounts, he was unable to provide an accounting supported by actual income and expenses.

69.     The Parties continued to negotiate, but to no avail.

70.     On or about September 27, 2021, Defendant Jacobs advised Plaintiff there was approximately $80,000.00 remaining of the Escrowed Funds and he was willing to release $40,000.00 to Plaintiff.

71.     There has been absolutely no rational explanation as to how the Escrowed Funds could have decreased by almost $50,000.00 in less than a year while Defendant BNC was not doing any business.

72.     In this latest proposal, Defendant Jacobs improperly deducted $12,500.00 for Defendant Jacobs' personal legal fees from the Escrowed Funds.  Incredibly, the legal invoices provided on two separately dated invoices (December 11, 2020 and June 29, 2021, respectively) nevertheless contain the same invoice number and provide no line item details.

73.     Upon information and belief, Defendant Jacobs received other funds through Defendant BNC or FluentStream directly.

74.     Upon information and belief, Defendant Jacobs improperly removed $100,000.00 (one withdrawal for $60,000.00 and the other for $40,000.00) from the Escrowed Funds claiming personal cash flow problems, but which were actually used as a down payment to qualify for a mortgage on a home in South Carolina.

75.     In addition, Defendant Jacobs improperly deducted MM Consulting CPA's (Maureen McLennon) fees from the Escrowed Funds.

76.     When Plaintiff questioned how the Escrowed Funds could have been reduced by so much money, let alone at all, Defendant Jacobs' personal attorney claimed, "Every year that a company is operating, there are some attendant costs: taxes, bookkeeping, taxes to be paid, and the like".

77.     Defendant Jacobs has yet to explain how a business with no income and no operations could incur taxes and expenses over $133,000.00 in less than two (2) years.

78.     Defendants have utilized the Escrowed Funds for their own purposes in violation of the terms of the Asset Purchase Agreement and Redemption Agreement.

### AS AND FOR A FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS
#### (Breach of Contract)

79.     Plaintiff repeats, reiterates, and realleges each and every allegation contained in Paragraphs "1" through "78" above, as if same were more fully set forth at length herein.

80.     Plaintiff has performed and fully complied with all of her obligations to Defendants under the Redemption Agreement.

81.     Defendants have failed to perform under the Redemption Agreement by failing to pay Plaintiff sixty-five percent (65%) portion of the Escrowed Funds, and by failing to establish there were any legitimate expenses in the winding up of Defendant BNC.

82.     The aforementioned acts of Defendants, as well as other acts to be discovered, constitute a breach of contract.

83.     As a result of the foregoing, Plaintiff has been damaged and demands judgment against Defendants in an amount unknown at this time and to be determined at trial, but believed at this time to be $176,836.00 from the Escrowed Funds, and $553,672.00 under the Promissory

Note, together with interest, and the costs and disbursements of this action, including Plaintiff's attorneys' fees.

## AS AND FOR A SECOND CAUSE OF ACTION AGAINST DEFENDANT JACOBS
### (Breach of Fiduciary Duties)

84.    Plaintiff repeats, reiterates, and realleges each and every allegation contained in Paragraphs "1" through "83" above, as if same were more fully set forth at length herein.

85.    At all times hereinafter mentioned, Defendant Jacobs, by virtue of his role as Managing Member of Defendant BNC, owed a fiduciary duty to Plaintiff, and was bound to perform his duties and serve with the utmost good faith and loyalty, with that degree of care which an ordinarily prudent person in any like position would use under similar circumstances.

86.    Such duties included, among other things, the proper distribution of the sales proceeds of Defendant BNC to its members.

87.    Based on the foregoing acts, Defendant Jacobs has failed to exercise the required degree of care and failed to perform his duties in good faith.

88.    As a result of Defendant Jacobs' breaches of fiduciary duties, Plaintiff has been damaged.

89.    The acts set forth above, as well as other acts yet to be uncovered by Plaintiff, constitute breaches of fiduciary duties.

90.    As a result of the foregoing, Plaintiff has been damaged and demands judgment against Defendant Jacobs in an amount unknown at this time and to be determined at trial, but believed at this time to be $176,836.00 from the Escrowed Funds, and $553,672.00 under the Promissory Note, together with interest, and the costs and disbursements of this action, including Plaintiff's attorneys' fees.

91.     Defendants' actions evidence such a high degree of moral culpability as to shock the conscience, be the equivalent of a criminal indifference to civil obligations, and are not merely isolated incidents, but disregard the rights of others to such an extent that Defendants are liable for punitive damages.

92.     As a result of the foregoing, Plaintiff has been damaged and demands judgment against Defendants for punitive damages in an amount to be determined by the Court upon the trial of this action, but believed to be in excess of $500,000.00.

## AS AND FOR A THIRD CAUSE OF ACTION AGAINST ALL DEFENDANTS
### (Accounting)

93.     Plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs "1" through "92" above, as if same were more fully set forth at length herein.

94.     As a result of the relationship between Defendant Jacobs and Plaintiff as set forth above, a fiduciary relationship existed.

95.     Defendants are in complete control of the financial records which would establish the extent to which they have received monies by wrongfully converting and otherwise misappropriating assets of Plaintiff.

96.     As a result of the foregoing, Defendants have a duty to account for monies wrongfully received.

97.     Plaintiff may have no adequate remedy at law.

98.     As a result of the foregoing, Plaintiff has been damaged and demands of Defendants a full and formal accounting to determine the amount of monies owed to Plaintiff.

## AS AND FOR A FOURTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
### (Constructive Trust)

99.     Plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs "1" through "98" above, as if same were more fully set forth at length herein.

100.    Defendants had and continue to have a confidential and/or fiduciary relationship with Plaintiff.

101.    Defendants took advantage of and/or otherwise abused the confidential and/or fiduciary relationship described hereinabove by breaching his obligations under the Redemption Agreement by failing to pay Plaintiff her portion of the Escrowed Funds.

102.    Defendants are knowing transferees of the fraudulent conveyances, conversions, and/or transferred assets, as set forth hereinabove.

103.    Such acts caused Defendants to receive economic benefits that they would not otherwise have received, but for the efforts of Plaintiff.

104.    Defendants paid insufficient and/or no consideration for such conveyances and/or transfers.

105.    It would be against equity and good conscience to permit Defendants to retain these benefits because they will have been unjustly enriched thereby.

106.    Plaintiff is entitled to the profits derived therefrom, and any assets, monies, properties, and the like otherwise diverted and/or converted by Defendants.

107.    Plaintiff may have no adequate remedy at law.

108.    As a result of such acts, as well as other acts to be uncovered, Defendant Jacobs is a constructive trustee, *ex malificio*, of such assets.

109.    As a result of the foregoing, Plaintiff seeks the imposition of a constructive trust over all property of Defendants, including but not limited to (a) assets of Defendants, including

his house in South Carolina located at 2668 Fountainhead Way, Mt. Pleasant, South Carolina 29466; (b) the proceeds of any and all transactions entered into by Defendants; and (c) the revenues generated in connection with any and all transactions entered into between Defendants and any of their actual or potential customers.

### AS AND FOR A FIFTH CAUSE OF ACTION AGAINST DEFENDANT JACOBS
#### (Breach of Common Law Duty of Loyalty)

110.     Plaintiff repeats, reiterates, and realleges each and every allegation contained in Paragraphs "1" through "109" above, as if same were more fully set forth at length herein.

111.     At all times hereinafter mentioned, Defendant Jacobs, by virtue of his membership in Defendant BNC and/or full-time employment with Defendant BNC, owed a common law duty of loyalty to Plaintiff, and was bound to perform his duties and serve with the utmost good faith and loyalty, and with that degree of care which an ordinarily prudent person in any like position would use under similar circumstances.

112.     Such duties included, among other things, the obligation to refrain from making material misstatements of fact, material omissions of fact, and/or material concealments of fact, as well as all of the other acts of Defendant Jacobs as sets forth above, in addition to those acts which are yet to be uncovered.

113.     Based on the foregoing acts, Defendant Jacobs has failed to exercise the required degree of care and failed to perform his duties in good faith.

114.     As a result of Defendant Jacobs' breaches of the common law duty of loyalty to Plaintiff, Plaintiff has been injured.

115.     The acts set forth above, as well as other acts yet to be uncovered, constitute breach of the common law duty of loyalty by Defendant Jacobs.

116.     As a result of the foregoing, Plaintiff has been damaged and demands judgment against Defendant Jacobs in an amount unknown at this time and to be determined at trial, but believed at this time to be $176,836.00 from the Escrowed Funds, and $553,672.00 under the Promissory Note, together with interest, and the costs and disbursements of this action, including Plaintiff's attorneys' fees.

117.     Defendants' actions evidence such a high degree of moral culpability as to shock the conscience, be the equivalent of a criminal indifference to civil obligations, and are not merely isolated incidents, but disregard the rights of others to such an extent that Defendants are liable for punitive damages.

118.     As a result of the foregoing, Plaintiff has been damaged and demands judgment against Defendant Jacobs for punitive damages in an amount to be determined by the Court upon the trial of this action, but believed to be in excess of $500,000.00.

## AS AND FOR A SIXTH CAUSE OF ACTION AGAINST DEFENDANT JACOBS
### (Conversion)

119.     Plaintiff repeats, reiterates, and realleges each and every allegation contained in Paragraphs "1" through "118" above, as if same were more fully set forth at length herein.

120.     Plaintiff has ownership of and a right of immediate possession to the Plaintiff's Escrowed Funds presently in the custody of Defendant Jacobs.

121.     Defendant Jacobs has, either directly or indirectly, exercised dominion and/or ownership over the Plaintiff's percentage of the Escrowed Funds through his actions described above, in addition to other acts yet to be uncovered, and has possession of converted property of Plaintiff.

122.     Defendant Jacobs' exercise of dominion and control over the foregoing is wrongful.

123.    Plaintiff did not authorize Defendant Jacobs' actions.

124.    All of Defendant Jacobs' wrongful acts were committed by him when he was a Managing Member of Plaintiff.

125.    To date, Defendant Jacobs has failed to return said Escrow Funds to Plaintiff, despite multiple demands.

126.    As a result of the foregoing, Plaintiff has been damaged and demands judgment against Defendant Jacobs in an amount unknown at this time and to be determined at trial, but believed at this time to be at least $500,000.00, together with interest, and the costs and disbursements of this action, including Plaintiff's attorneys' fees.

127.    Plaintiff is additionally entitled to the return of the foregoing Property in the possession of Defendant Jacobs and/or third parties.

128.    As a result of the foregoing, Plaintiff may have no adequate remedy at law.

129.    Defendant Jacobs' actions evidence such a high degree of moral culpability as to shock the conscience, be the equivalent of a criminal indifference to civil obligations, and are not merely isolated incidents, but disregard the rights of others to such an extent that Defendant Jacobs is liable for punitive damages.

130.    As a result of the foregoing, Plaintiff has been damaged and demands judgment against Defendant Jacobs for punitive damages in an amount to be determined by the Court upon the trial of this action, but believed to be in excess of $500,000.00.

**WHEREFORE**, Plaintiff seeks judgment as follows:

(a)    On the **First Cause of Action**, Plaintiff has been damaged and demands judgment against all Defendants in an amount unknown at this time and to be determined at

trial, but believed at this time to be $176,836.00 from the Escrowed Funds, and $553,672.00 under the Promissory Note;

(b)    On the **Second Cause of Action**, Plaintiff has been damaged and demands judgment against Defendant Jacobs in an amount unknown at this time and to be determined at trial, but believed at this time to be $176,836.00 from the Escrowed Funds, and $553,672.00 under the Promissory Note; and demands judgment against Defendants for punitive damages in an amount to be determined by the Court upon the trial of this action, but believed to be in excess of $500,000.00;

(c)    On the **Third Cause of Action**, Plaintiff has been damaged and demands of Defendants a full and formal accounting to determine the amount of monies owed to Plaintiff;

(d)    On the **Fourth Cause of Action**, As a result of the foregoing, Plaintiff seeks the imposition of a constructive trust over all property of Defendants, including but not limited to (a) assets of Defendants, including his house in South Carolina located at 2668 Fountainhead Way, Mt. Pleasant, South Carolina 29466; (b) the proceeds of any and all transactions entered into by Defendants; and (c) the revenues generated in connection with any and all transactions entered into between Defendants and any of their actual or potential customers.

(e)    On the **Fifth Cause of Action**, Plaintiff has been damaged and demands judgment against Defendant Jacobs in an amount unknown at this time and to be determined at trial, but believed at this time to be $176,836.00 from the Escrowed Funds, and $553,672.00 under the Promissory Note; and demands judgment against

Defendants for punitive damages in an amount to be determined by the Court upon the trial of this action, but believed to be in excess of $500,000.00;

(f)     On the **Sixth Cause of Action**, Plaintiff has been damaged and demands judgment against Defendant Jacobs in an amount unknown at this time and to be determined at trial, but believed at this time to be at least $500,000.00; Plaintiff is additionally entitled to the return of the foregoing Property in the possession of Defendant and/or third parties; and demands judgment against Defendants for punitive damages in an amount to be determined by the Court upon the trial of this action, but believed to be in excess of $500,000.00.

(g)     Pre- and Post-Judgment Interest;

(h)     Plaintiff's attorneys' fees;

(i)     Plaintiff's costs and disbursements of this action; and

(j)     Such other, further, or different relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands Trial by Jury on all issues so triable.

Dated: Mineola, New York
       January 17, 2022

                              **LEVITT LLP**

                              By: Steven L. Levitt (SL3323)
                              Karen L. Weiss (KW0766)
                              *Attorneys for Plaintiff*
                              129 Front Street
                              Mineola, New York, 11501
                              Tel:  (516) 248-9700
                              Fax:  (516) 741-9224
                              slevitt@levittlawllp.com
                              kweiss@levittlawllp.com

## INDIVIDUAL VERIFICATION

STATE OF NEW YORK          )
                                         ) ss
COUNTY OF WESTCHESTER      )

BEATRICE CUSHNER, being duly sworn, deposes and says:

I am the Plaintiff in the within Verified Complaint; I have read the foregoing

**VERIFIED COMPLAINT** and know the contents thereof and the same are true to my

knowledge, except those matters therein which are stated to be alleged on information and belief,

and as to those matters I believe them to be true.

*Beatrice M. Cushner.*
Beatrice Cushner

Sworn to before me this
11th day of January, 2022

_____
Notary Public

PATRICIA M PIRRAZZI
Notary Public - State of New York
NO. 01PI6045389
Qualified in Putnam County
My Commission Expires Oct 21, 2022